IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

AIKEN DIVISION

| | |
|---|---|
| AL ZEINY, | ) Civil Action No. 1:09-2821-TLW–JRM |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | )**REPORT AND RECOMMENDATION** |
| WASHINGTON SAFETY MANAGEMENT | ) |
| SOLUTIONS, LLC, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| ——————————————————— | ) |

Plaintiff, Al Zeiny, filed this action on October 28, 2009.  He alleges claims under Title VII

of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII").[1]  He also

alleges a claim under South Carolina law.  Defendant, Washington Safety Management Solutions,

LLC ("WSMS")[2] filed a motion for summary judgment on March 30, 2011. Plaintiff filed a

memorandum in opposition on April 18, and Defendant filed a reply on April 28, 2011.  On May 2,

2011, Plaintiff filed a motion to strike affidavits attached to Defendant's reply.  Defendant filed a

response on January 9, and Plaintiff filed a reply on January 18, 2012.

---

[1]Pretrial matters in this case were referred to the undersigned pursuant to Rule 73.02(B)(2)(g)
DSC.  Because this is a dispositive motion, this report and recommendation is entered for review by
the court.

[2]WSMS was previously a subsidiary of Washington Group International ("WGI"). In 2007,
WGI merged with URS Corporation ("URS") and WSMS became a subsidiary of URS.  Bill Thomas
Dep. 48-50.  The name of WSMS has since been changed to URS Safety Management Solutions, a
division of URS.

**<u>FACTS</u>**

1.  Plaintiff is a Muslim and was born in Egypt. He came to the United States to attend graduate school in 1991, and became a naturalized citizen of the United States in 2001. P. Dep. 27, 29.

2.  Upon graduation, Plaintiff worked at California State University for approximately five years, and at University of Evansville in Indiana for approximately four years. In 2006, Plaintiff began working at Parsons Technology in 2006 as a structural engineer. P. Dep. 37-39.

3.  Plaintiff started working as a structural engineer for Defendant in January 2007. P. Dep. 108, 112; Ex. 8; Mulligan Aff., Para. 4.

4.  Plaintiff reported to Bill Thomas ("Thomas"), who was the Supervising Structural Engineer, who in turn reported to John Cron, the Engineering Manager, and Tor Osmundsen ("Osmundsen"), the Director of Engineering. Ron Mulligan ("Mulligan") was the Business Manager for the Unit. P. Dep. 123-124.

5.  Defendant is a contractor for the United States Department of Energy ("DOE"). The DOE requires contractors to have certain computer security procedures. Defendant employs a Computer Cyber Security Officer, Steve Lape ("Lape"), to monitor compliance with its policies and insure that the computer network is protected from potential compromises. Lape Dep. 5-7. Additionally, Defendant is subject to oversight by the DOE's Counterintelligence Office. Lape Dep. 36.

6.  Various software programs and computer usages can place Defendant's network at risk of compromise by outside parties. Defendant employs firewalls and security devices including Cisco Security Agent, to help guard against and detect any breach in its security. Employees

are required to sign and comply with two separate policies regarding their computer usage: the Acceptable Use Policy and the Security Control Security Policy.  P. Dep., Exs. 10 and 11; Lape Dep. 74-75.

7.      The Acceptable Use Policy, which was signed by Plaintiff,[3] provided that Plaintiff agreed to abide by WSMS's Information Technology security policies, to not allow unauthorized personnel access to WSMS's computer systems, to not introduce unauthorized software onto WSMS's computer systems, to not introduce unauthorized software onto WSMS's computer system without prior approval from local IT management, to comply with WSMS's Remote Access Policy, and to not disable or reconfigure computer protection programs if installed on the provided computer.  P. Dep., Ex. 10.

8.      The Security Control Procedure, which was signed by Plaintiff on April 18, 2007, governs the use of WSMS's computing resources and the protection of confidential information.  In it, Plaintiff agreed that he would not introduce unauthorized software to a WSMS computer without the approval of the Network Operations Manager and Corporate Computer Security Officer, not disable any computer protection programs (virus protection, personal firewall, etc.) installed on his computer, would not connect non-WSMS hardware to any WSMS computer or the WSMS network without the approval of the Network Operations Manager and the Corporate Computer Security Officer, and would not connect a WSMS computer to a wireless network without the approval of the Network Operations Manager and the Corporate Computer Security Officer.  P. Dep., Ex. 11.

_____

[3]Although Plaintiff admits that it is his signature on the policy, he disputes the date it was signed because the date is allegedly not in his handwriting.  P. Dep. 115-116.

9.  Plaintiff was one of three Muslim employees working in the Structural Engineering Group. As a practicing Muslim, Plaintiff prays five times per day, with three of these times potentially falling within the work day, depending on the time of year. P. Dep. 131, 138.

10. Prior to Plaintiff's employment, Defendant's employees were permitted time to pray during work, but for the most part prayed in their offices or cubicles. Mulligan Aff., Para. 5.

11. Plaintiff desired to pray in a group with the other Muslim employees, and he and other Muslim employees began using the conference room for their daily prayers. P. Dep. 137. One day, in approximately April or May 2007, Mulligan walked in on the group as they were praying. P. Dep. 132.

12. Mulligan went to Plaintiff's cube and asked why they were praying together in the storage room. Plaintiff replied that the conference rooms were full of chairs and there was no room there. He claims Mulligan was yelling loudly. Mulligan told Plaintiff that he would force him to refrain from praying at the office and would stop Plaintiff by force if he had to do so. P. Dep. 132-133, 140; Nazir Sheikh Aff., ¶ 6.[4]

13. Mulligan later apologized to Plaintiff. Plaintiff claims that Mulligan and other management employees decided to force him to perform his prayers in the conference room, which took

---

[4]Mulligan claims he walked in on Plaintiff praying in the conference room, not the storage room, and he was concerned that Defendant had only one conference room in the building and he did not know how he could permit a group of employees to use the room every day. He claims he checked with Human Resources to determine what options were available, and it was decided to permit the employees to use a large storage room for their daily prayers. Mulligan Aff., ¶ 6; Myers Dep. 46.

4

him extra time to pray because he had to move furniture around (and back into place) to do so.  P. Dep. 137-138; Nazir Sheik Aff., ¶ 6.[5]

14. After this meeting, no one ever said anything to Plaintiff about his prayers or tried to impede him from having the time and place to pray.  P. Dep. 137-138, 141.

15. At an unspecified date, however, Mulligan came into the restroom and saw the group washing their feet and asked what they were doing.  Nazir Sheikh ("Sheikh"), a former employee of Defendant, states that Mulligan looked disgusted and angry and it was clear he did not approve of them preparing for prayer.  He claims Mulligan and other co-workers made jokes about Sheikh and Plaintiff that they probably got water all over the floor from missing the toilet.  Sheikh Aff., ¶¶ 10-11.

16. Several months later, the cleaning crew noted that the men's bathroom floor was constantly wet, which was causing an unsafe condition.  Thomas Dep. 120.  During a staff meeting, Thomas told his staff that they needed to be careful not to wet the bathroom floor when using the facilities.  Although no employees were mentioned by name, Plaintiff was offended because he claims that Mulligan compared the prayer water splashes to urination on the floor and believed Mulligan was inferring that Plaintiff's preparation for prayer consisted of his urinating on the floor.  P. July 2010 Aff., ¶ 3.

---

[5]Mulligan claims he called Plaintiff and two other Muslim employees into his office, apologized for walking in on them, told them Defendant would accommodate their request for a place to pray, and arranged for them to use a large storeroom.  He says it was not until later, when the Structural Engineering Group moved to another building, that Muslim employees were permitted to use a conference room, because in the new building there were several conference rooms available.  Mulligan Aff., ¶ 6.

17.     In September 2007, Plaintiff forgot his voicemail password and asked Stacie Usry ("Usry"), the administrative assistant in his unit, to have Computer Support reset it. After the password was reset, his voicemail malfunctioned in that all of his previous voicemails, which he had deleted, reappeared. Computer Support told him there was glitch in the system. Plaintiff claims this response "insulted his intelligence." Several days later, Plaintiff sent an email to his managers stating he thought someone might be hacking into his voicemail and email, attached an article about the government spying on individuals, and attached an email from a former co-worker at Parsons telling Plaintiff that another co-worker at Parsons may have reported him as being a terrorist. P. Dep. 191, Exs. 13 and 14; Mulligan Aff., ¶ 7.

18.     On October 22, 2007, Plaintiff sent an email to his managers stating that the event logger on his computer indicated someone used his computer while he was out of town. Lape directed that Plaintiff's laptop and desktop computers be removed from the network and imaged to investigate and make sure no one compromised the system. Lape Dep. 21, Ex. 1 (405).

19.     Lape found no evidence that anyone hacked into the system using Plaintiff's computers, but discovered that one of Plaintiff's co-workers, Malgosia Mackmull ("Mackmull"), attempted to log into the system, using her own log-in information, from Plaintiff's computer. It is not a violation of Defendant's policy to use another employee's computer as long as the employee using it logs on using that employee's own log-in information. See P. Dep. 220, Lape Dep. 69.

20.     While reviewing Plaintiff's computers, Lape discovered Plaintiff had installed a large amount of software on his computers, including such things as Skype, Team Viewer, DynGate, and several other software programs that were not on Defendant's approved list and for which

Plaintiff had not received permission. Several of the software programs Plaintiff downloaded would have bypassed Defendant's firewalls and security protocols. Lape reported his findings to management and Lape agreed he would monitor Plaintiff's computer periodically to make sure there were no other violations of Defendant's computer security policies. Lape Dep. 22-23, 41-42; P. Dep., Ex. 18.

21. On November 20, 2007, Plaintiff's managers met with him and warned him about installing unauthorized software.[6] Plaintiff agreed that in the future he would inquire about software to see if it was acceptable before he downloaded it. Dep. Ex. 17; Mulligan Aff., Para 9.

22. Plaintiff claims he was harassed because a co-worker, Usry, stayed late whenever he worked, would play with her son in the office because she had nothing else to do, would pass by his office every few minutes and often ask him questions such as "are you still working" and "isn't it too late to be working." As Usry also did some work for IT (see Thomas Dep. 52), Plaintiff appears to infer that Usry was spying on him. P. Dep. 49-50, 199-201.

23. Plaintiff claims he was harassed by a co-worker, John Heneage ("Heneage"). After Plaintiff returned from a trip to Egypt, Heneage told Plaintiff that Osmundsen's son, who was in the Navy in Egypt, saw Plaintiff at the Suez Canal holding a bomb and waiting for the American Navy ship to pass by him. P. July 2010 Aff., ¶ 4. About a week after the prayer incident with Mulligan, Heneage told Plaintiff that "there is something wrong with you guys [Islam]; that's why you are in the third world." P. Dep. 152-153. After Sheikh was fired, Heneage began opening the subject of religion more often and would bring it up "out of the blue." P. Dep.

---

[6]Plaintiff does not dispute that the meeting occurred, but claims he never saw the written warning. P. Dep. 230-233.

155.  Heneage made comments about Bin Laden sharing Plaintiff's religion and Plaintiff was offended because Heneage's comments appeared to accuse him of being a bad person.  P. Dep. 156-157.  Heneage also called Plaintiff a scary guy and said Plaintiff was not a full-American.  P. Dep. 159-162.

24.  Jim Robinette ("Robinette"), Plaintiff's co-worker who was a friend of Mulligan, walked by Plaintiff's desk and shot him "the bird."  Plaintiff complained, but Robinette was not disciplined because he denied doing this action.  P. Dep. 163-168, 281-282.

25.  Plaintiff also claims that Lape was suspicious of Plaintiff and held animosity towards him because Lape knew that the Federal Bureau of Investigations ("FBI") was interested in Plaintiff's computer.

26.  In July 2008, Plaintiff reported to Computer Support that he was not being authenticated to the network and was having to use a VPN connection[7] to log onto the system from his office.  Computer Support was unable to solve the problem, took Plaintiff's computer to investigate, and gave him a replacement to use.  P. Dep. 251, 253, 255-256.

27.  Lape decided to check Plaintiff's computer because he had not had time to periodically monitor it as planned.  He discovered a large amount of unauthorized software that Plaintiff had installed without permission.  Lape Dep. 26, Ex. 1 (570).

28.  Lape notified Plaintiff's managers and Human Resources Department of this issue on September 3, 2008.  A meeting was held with Plaintiff's managers and Ted Myers ("Myers"), Director of Human Resources, to discuss how to proceed regarding this second violation by

_____

[7]A VPN (virtual private network) connection is a device which enables employees to remotely log onto Defendant's network.

Plaintiff of Defendant's computer security policies. During the meeting, although there was discussion about terminating Plaintiff's employment, it was decided to give Plaintiff a second and final warning which he had to sign to agree to comply with all of Defendant's security policies in the future. Mulligan, with assistance from Myers, drafted the warning on September 10, 2008. Myers Dep. 13; Thomas Dep., Ex. 20; Mulligan Aff., ¶ 11; <u>see</u> P. Dep., Ex. 32 (letter).

29.  Because Plaintiff was due to be out of the office on business, it was decided to wait until he returned to give him the warning. Thomas Dep., Ex. 20; Mulligan Aff., ¶ 11.

30.  During his business trip, Plaintiff claims that his VPN connection was disabled, such that he was embarrassed in front of the client because he could not access some information, although he saved some information on his personal computer and was able to access it (even though it was not the most up-to-date file). P. Dep. 261-263, 266-267.

31.  Upon returning from his business trip on September 29, 2008, Plaintiff informed Osmundsen and Thomas by email that he was seriously considering leaving WMSC due to "mistreatment and harassment." P. Dep., Ex. 25.

32.  Plaintiff's managers met with Plaintiff the day they received the email. Plaintiff reported he was offended by a comment made by Michael Bombard from Computer Support "to stop breaking things" and two emails sent by a co-worker, Heneage, on October 31, 2007, and March 10, 2008. P. Dep., Ex. 25; Mulligan Aff., ¶ 12. Plaintiff also reminded Osmundsen and Thomas about the prayer issue and related other past instances in which he believed co-workers harassed him. At the end of the meeting, Osmundsen informed Plaintiff that unauthorized software was again found on his computer, but did not give him a warning at

that time because they first wanted to investigate Plaintiff's claim of harassment. P. Dep. 280-283.

33.    On September 30, 2008, Plaintiff forwarded Osmundsen copies of the emails from Heneage. The first of these emails, dated October 31, 2007, was sent to four employees and began "You're an EXTREME Redneck When......" The second email, dated March 10, 2008, was sent to eight employees including Plaintiff and was titled "You Might be a Terrorist If....." Pl. Dep., Exs. 15, 16, 26.

34.    Mulligan met with Heneage to give him a written warning and inform him that further violation could result in further discipline, up to and including termination. Heneage signed the warning, but commented in writing on the warning that he did not believe the email was harassment and that he inadvertently forwarded it to Plaintiff. Mulligan Aff., Para. 13; Thomas Dep., Ex. 11 and 20.

35.    Also on September 30, 2008, Plaintiff stated in an email to Osmundsen that he was "very satisfied with all of your efforts to resolve my concerns and I thank you very much for everything. I am very pleased that we will start a new page and forget the past. There is no need to proceed any further and hurt the feelings of more people." P. Dep., Ex. 31.

36.    After receiving a list of the unauthorized software Lape found on Plaintiff's computer in the second unauthorized software incident, Plaintiff sent an email to Osmundsen and Thomas on September 30, 2008. Plaintiff attempted to clarify the incidents behind the software on the list, claimed that Defendant's polices were being used to harass and frustrate him, and stated he did not understand why Lape thought he needed to bring this issue to the attention of management. P. Dep., Ex. 30.

37.  In a second email to Osmundsen on September 30, 2008, Plaintiff asked Osmundsen to assure Lape that Plaintiff was willing to comply with Company policy to the best of his ability, but Plaintiff expected Lape and the Computer Support staff to trust his word, his word was enough, and he got offended if people doubted his integrity.  P. Dep., Ex.31.

38.  Osmundsen forwarded Lape Plaintiff's explanations.   Lape responded on October 1, 2008, stating that Plaintiff needed to remember that he agreed not to install any software without going through his management and computer security after the first incident.  Lape agreed to investigate how long the software programs were installed, but reiterated that (except for one of the programs listed) Plaintiff did not request permission to install the programs as required by Defendant's.  Thomas Dep., Ex. 15.

39.   Osmundsen, Mulligan, and Thomas met with Plaintiff on October 2, 2008 to give him a written warning for the second incident of installing unauthorized software.  During the meeting, Plaintiff became upset and stated he should just quit and find another job. Osmundsen told Plaintiff that no one wanted him to quit, but this was a formality that had to be done.  Plaintiff refused to sign the warning.  Mulligan told Plaintiff that refusing to sign did not make the warning invalid and Mulligan wrote on the warning "employee refused to acknowledge or sign."  Mulligan Aff., Para. 15; P. Dep, Ex. 32.

40.  Mulligan informed Myers (Director of Human Resources), that Plaintiff refused to sign the warning.  Myers told Mulligan to give Plaintiff one more chance to sign and if he did not, Defendant would proceed with terminating Plaintiff's employment. Lape Dep., Ex. 1 (00301 and 00479); Mulligan Aff, Para. 16.

41. On the morning of October 3, 2008, Plaintiff informed Osmundsen in an email that he considered the warning retaliation, demanded Mulligan invalidate the warning letter and confirm the warning had been dismissed. He further asked him to confirm that under no circumstances could the warning be brought up again or used against him. P. Dep., Ex. 34.

42. Osmundsen replied that the warning was not retaliation, and explained that the security violation had been detected, and the warning letter written, prior to Plaintiff notifying his managers about his claims of harassment on September 29, 2008. He further told Plaintiff that he was glad Plaintiff had shared the instances of alleged harassment, Defendant had taken appropriate actions to stop any such behavior, and a signed warning had been placed in Heneage's file due to inappropriate emails and misuse of company property. P. Dep., Ex. 35. Heneage did not sign a warning until October 6, 2008. The warning concerned non-business related emails sent to Plaintiff which Plaintiff said were offensive to him because of his ethnic and religious beliefs. Heneage was informed that this was a "first written warning and further violations will lead to disciplinary action up to and including termination according to company policy." P. Opp. Mem., Ex. 33 (571).

43. The next day Plaintiff emailed Osmundsen stating that it was "not in the best interest of the company if I leave" and attaching an article entitled "A Bidding War for Engineers."

44. Plaintiff claims he was running sophisticated and unusual computer engineering software that was not run on the typical computer and he had been told by Michael Bombard in systems that he could disable Cisco when it caused trouble. P. Dep. 238, P. July 2010 Dep., ¶ 6. He also complains that Lape did not realize that, when Plaintiff went to Egypt on an extended personal trip, his supervisor had given him permission to take his business laptop

with him to Egypt and to move his personal information on the business laptop because customs in Egypt only allowed one laptop without paying a hefty custom tariff.  <u>See</u> Lape Dep. 32-33.

45.    Plaintiff's managers met with him again on October 6, 2008 to try to get him to sign the warning and would agree to not violate the computer policy in the future.  Plaintiff was given a copy of the warning and proceeded to cross out the unauthorized software listed.  Mulligan told Plaintiff he had already admitted to installing the listed software and gave him a copy of the email Lape sent to Plaintiff in response to Plaintiff's claims that the software was harmless.  Plaintiff replied that Lape was not as competent as Plaintiff was in computer software and Plaintiff had never signed the Acceptable Use Policy.  Mulligan decided to end the meeting and meet again the next day in order to locate the copy of the policy signed by Plaintiff.  Mulligan Aff., Para. 17.

46.    On October 7, 2008, Plaintiff sent an email to Mulligan requesting a meeting with the head of human resources.  Upon being informed that a meeting was set for 9:00 that morning with Myers, Plaintiff stated it was too soon and that he needed time to prepare documents to take with him to present his case.  Thomas Dep., Ex. 22.

47.    Plaintiff failed to show up for the meeting, but later sent an email to Thomas asking for "three simple" requests: (1) to stop his ability to install any software on his computer; (2) to leave him alone to do his job; and (3) "to start a new page and don't open the past and don't take it against me or put anything in my file."  He explained that he became scared in the meeting the day before when Mulligan told him if he violated the policy again he could be fired and

13

because he thought the warning he was given to sign that day was different than the warning given to him a few days earlier.[8]  P. Dep., Ex. 39.

48.   After receiving Plaintiff's email and requests, Mulligan contacted Myers and they agreed that the situation was not going to be resolved because Plaintiff continued to make additional demands which Defendant could not agree to, and because Plaintiff continued to refuse to acknowledge and take responsibility for his actions.  Myers Dep. 31-33; Mulligan Aff., Para. 18.

49.   On the afternoon of October 7, 2008, Thomas and Mulligan met with Plaintiff and gave him a letter of termination.  Plaintiff replied that he would see them in court.  Mulligan escorted Plaintiff to his office while Thomas went to get boxes for Plaintiff to pack his belongings, and Thomas drove Plaintiff home.  Mulligan Aff., Para. 19.

50.   A week after Defendant terminated his employment, Plaintiff sent an email to Thomas and Osmundsen requesting they hire him as a contractor.  Plaintiff said that in return for this work, he would have no need and no reason to complain about any discrimination or double standards.  P. Dep., Ex. 40.

51.   Plaintiff also was communicating with Branko Galunic ("Galunic"), the Chief Structural Engineer for URS's Fort Mill, South Carolina site, about possible employment.  In the spring of 2008, Plaintiff sent his resume to the Fort Mill site to see about possible employment there. Galunic was interested in hiring Plaintiff because of his knowledge of seismic engineering.

---

[8]At his deposition, Plaintiff explained he thought the first warning letter he was given was not dated and was not as harsh as the second letter.  He believed the second letter was backdated to show a date prior to Plaintiff's complaint to Osmundsen regarding harassment. P. Dep. 316-317.  As Mulligan testified, however, he drafted the warning letter on September 10, 2007, and at both meetings Plaintiff was given a copy of the same September 10 letter.  Mulligan Aff., ¶ 17.

Galunic testified that he had a number of telephone conversations with Plaintiff regarding possible employment, but heard Plaintiff had been terminated from Defendant for cause, so he informed Plaintiff that he could not hire him. Galunic testified that he thought he heard in passing from someone in the Fort Mill Human Resources Department that Plaintiff's termination had something to do with an encrypted email, but he does not know how that person received the information. Galunic Dep. 6, 10, 13-16, 25.

52.   In early 2008, Donna Nicols, Defendant's Director of Security and Ethics, received a visit from Pat Kenney, the Counterintelligence ("CI") Officer for the DOE's Savannah River Operations Office, asking if he could review Plaintiff's personnel file. Defendant provided this for CI Officer Kenney. Lape Dep. 35-36, Ex. 1 (00556).

53.   At an unspecified later date when Kenney was at Defendant's office for an unrelated matter, Kenney learned that Plaintiff had been discovered installing unauthorized software on his computer. Kenney met with Lape to get more information regarding this issue and told Lape he would be contacting the FBI. Lape Dep. 37.

54.   Approximately a week after Kenney's visit with Lape, two FBI agents showed up at Defendant's office and requested Plaintiff's two hard drives, which Lape gave them. Lape Dep. 37-38.

55.   Thereafter, the FBI agents contacted Lape every six or eight weeks to ask if there had been any other incidents with Plaintiff's computers. During one of the calls, Lape told the agent there had been another incident when Plaintiff again installed unauthorized software. The FBI returned to Defendant's office on September 5, 2008, and took possession of Plaintiff's

third hard drive. Lape states he had no knowledge as to why the FBI was interested in Plaintiff or his computers. Lape Dep. 64-65.[9]

## STANDARD FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). A fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. Anderson, 477 U.S. 242 at 248. "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

The defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 477 U.S. at 247-48).

"[O]nce the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The party

---

[9]Plaintiff argues that there are issues of material fact as to why Defendant contacted the FBI regarding Plaintiff's computer. Defendant, however, has receipts showing the FBI took two of the computers on April 25, 2008, and one on September 5, 2008.. See Lape Dep., Ex. 2.

asserting that a fact cannot be or is genuinely disputed must support the assertion by: (1) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (2) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c) (1)(A-B).

Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987); Evans v. Technologies Applications & Servs. Co., 80 F.3d 954 (4th Cir. 1996). If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials-including the facts considered undisputed-show that the movant is entitled to it; or (4) issue any other appropriate order. Fed. R. Civ. P. 56(e)(1-4).

## **DISCUSSION**

Plaintiff alleges that Defendant discriminated against him based on his religion and national origin in violation of Title VII. He also asserts a claim for harassment/hostile work environment and a claim for retaliation under Title VII. Additionally, Plaintiff alleges a claim under South Carolina law for defamation. Defendant argues that its motion for summary judgment should be granted because: (1) Plaintiff fails to establish a prima facie case of discriminatory discipline, it had a legitimate, nondiscriminatory reason for disciplining Plaintiff, and Plaintiff fails to show pretext; (2) Plaintiff cannot establish a prima facie case of retaliation, Defendant had legitimate, non-retaliatory

reasons for Plaintiff's discipline and subsequent discharge, and Plaintiff fails to show pretext; (3) Plaintiff fails to establish a claim for harassment because many of the alleged harassing acts did not occur or were not motivated by religious or national origin animosity, the alleged conduct was not sufficiently severe or pervasive as to create an abusive environment, and there is no basis for imputing liability to WSMS for Plaintiff's harassment claims; and (4) Plaintiff fails to establish a claim for defamation.

A.    Disparate Discipline

Title VII makes it "an unlawful employment practice for an employer--(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...."  42 U.S.C. § 2000e-2(a)(1).  To establish a prima facie case of disparate discipline, a plaintiff must show "(1) that plaintiff engaged in prohibited conduct similar to that of a person of another race, color, sex, religion, or national origin, and (2) that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person." Lightner v. City of Wilmington, N.C., 545 F.3d 260 (4th Cir. 2008)(citing Moore v. City of Charlotte, 754 F.2d 1100, 1105-06 (4th Cir. 1985))(adapting the McDonnell Douglas[10] framework for the employee discipline context). Once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory basis for the challenged employment action.  McDonnell Douglas, 411 U.S. at 802.  If the employer provides the required evidence of a nondiscriminatory reason for the action, the plaintiff must then show that the proffered reasons were not the true reasons for the employment action, but were a pretext for

_____

[10]McDonnell Douglas v. Green, 411 U.S. 792 (1973).

18

discrimination.  Id. at 804; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).

(1)    Prima Facie Case

Plaintiff alleges that he was subjected to disparate discipline because Heneage engaged in comparable acts of seriousness regarding software issues on his computer, but was disciplined less severely.  He also appears to allege that he (Plaintiff) was disciplined more severely than other employees because Lape testified that other employees who installed software and then uninstalled the software were usually not disciplined.  Defendant argues that Heneage did not engage in comparable acts of seriousness, and Plaintiff cannot establish a prima facie case of disparate discipline because he has not shown that a similarly-situated person outside the protected class was disciplined less severely.

Plaintiff fails to show that the unnamed persons who allegedly installed software, uninstalled it, and were not disciplined engaged in misconduct of comparable seriousness.  He has presented nothing to identify these employees, to show that they installed as large an amount of unauthorized software as Plaintiff, to show that these employees disabled and evaded Defendant's firewalls with their software as Plaintiff allegedly had done, or to show they continued to install unauthorized software after have been advised not to do so (as opposed to Plaintiff).  In making a comparison of a plaintiff's treatment to that of employees outside the protected group, a plaintiff must show that the comparables are similarly situated in all relevant respects.  See Mitchell v. Toledo Hospital, 964 F.2d 577 (6th Cir. 1992); see also Linear v. Safeway Grocery, 843 F.2d 298 (8th Cir. 1988)(plaintiff must prove that he and non-protected employee were similarly situated in all respects and the other employee's acts were of comparable seriousness to his own); see also Heyward v. Monroe, 166 F.3d

332, 1998 WL 841494 (4th Cir. Dec. 7, 1998)(unpublished)(employees similarly situated only if they "dealt with the same supervisor, [were] subject to the same standards and...engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." (citations omitted)), cert. denied, 527 U.S. 1036 (1999); Smith v. Stratus Computer, Inc., 40 F.3d 11 (1st Cir. 1994)(in disparate treatment cases, employees must be similar in "all relevant aspects" including performance, qualifications, and conduct)(citation omitted), cert. denied, 514 U.S. 1108 (1995); see also Mahomes v. Potter, 590 F.Supp.2d 775 (2008)(finding that the disciplinary history of comparable employees was not similar where the comparator had not been disciplined for over two years before he was given a written warning for the same violation for which Mahomes was terminated where Mahomes had accumulated multiple suspensions in the two years prior to her final misconduct).

Plaintiff also fails to show that Heneage engaged in acts of similar seriousness and was disciplined less severely. Although Plaintiff argues that Heneage violated a computer software policy, the activity that Heneage committed was the sending of improper emails, not the use of software. Further, Heneage was given a written warning for his actions. Plaintiff argues that the written warning was not the same as he received because the warning was not for violating the computer policies, but for allegedly harassing Plaintiff. The warning, however, discusses the allegedly harassing email. Plaintiff claims that he did not receive a written warning as to his installation of unauthorized software in 2007. Thus, it is arguable that Heneage was actually disciplined more severely than Plaintiff. Regardless, Heneage received a written warning, which is the same disciplinary action Defendant attempted to give Plaintiff for his second violation of the Defendant's computer security policies.

(2)    <u>Legitimate, Nondiscriminatory Reasons/Pretext</u>

Even if Plaintiff can establish his prima facie case of disparate discipline, Defendant has articulated legitimate, nondiscriminatory reasons for disciplining Plaintiff, that he twice violated Defendant's computer security policies and he refused to sign the warning and take responsibility for his action. Plaintiff argues that he has shown pretext because there are material issues of fact as to whether he had permission for the software on his computer in November 2007 and September 2008, whether someone else installed the software, whether any of the software programs would have bypassed firewalls or security protocols, and as to the seriousness of the alleged software violations.

Plaintiff argues that there is an issue of material fact as to whether his co-worker Mackmull logged into his computer in 2007 and installed software. This fails to show pretext as Plaintiff admitted that Mackmull was not able to log-in using his name. Plaintiff's Dep. 218. Lape testified that if someone installed software on his computer using their log-in (rather than Plaintiff's) it would be installed under that person's name, not Plaintiff's. Lape Dep. 69-70.

Plaintiff argues that Defendant's reasons for its actions are false because he had permission to install some of the software programs, some of the programs did not use the network, and he had permission to bypass the firewall as shown by the fact that he had been granted a VPN token. This fails to show pretext. Plaintiff has not denied that at least some of the software he installed was unauthorized. Although he claims that his immediate supervisor authorized him to install Skype, the computer policies call for approval from the Network Operations Manager and Computer Officer before installing software not on the approved list. P. Dep., Ex. 11. The issue of whether the software connects to the network or whether Plaintiff could already use a VPN token which allegedly

bypassed the firewall also does not show pretext as it fails to show that Plaintiff's installation of software was authorized.[11]  Additionally, Plaintiff has offered only his own opinion as to whether these programs would bypass Defendant's security measures or potentially harm Defendant's computer system.

Plaintiff claims that he has shown pretext because Defendant offered different justifications for Plaintiff's termination.  He argues that Myers said Plaintiff was terminated for his refusal to sign the warning, Thomas said it was because of Plaintiff's installation of unauthorized software, and Mulligan recommended termination because of Plaintiff's accusations about other employees.[12]

The alleged differences between the explanations of Myers and Thomas are not pretextual.  As noted above, Defendant asserts that Plaintiff was to be given a written warning for the second offense of installing unauthorized software,  if he signed the warning his employment would not have been terminated, and Plaintiff refused to sign the warning such that Defendant had no choice but to terminate him.  These facts are part of the same sequence of events and are consistent with the

_____

[11]Further, whether or not Team Viewer can bypass WSMS's security or not, Plaintiff cannot show that Defendant did not have a good faith belief that it did.  See Thomas Dep., Ex. 6.  Gary Bevirt ("Bevirt"), URS Energy & Construction, Inc., IT Manager, states that:

> A VPN token permits an employee to remotely connect to the company's computer system just as if the employee was at the company.  Connecting through a VPN connection does not bypass the system's firewalls as Mr. Zeiny claims.  The system's firewalls remain in effect even while an employee is connected through a VPN connection.

Bevirt Aff., Para. 5.

[12]Plaintiff also argues that the reasons given for the disciplinary actions are false because Galunic was told that Plaintiff was terminated for failing to translate an Arabic or encrypted email.  Galunic, however, was not involved in any way in the decision to terminate Plaintiff's employment.  Further, there is no evidence that Galunic learned of any of the alleged reasons for Plaintiff's termination until after Plaintiff was terminated.

testimony of Myers and Thomas. Although Plaintiff argues that Mulligan said Plaintiff was terminated because of his accusations against other employees, Mulligan's notes reflect that after Plaintiff refused on two separate occasions to sign the warning, persisted in making demands to his managers, and made accusations, Mulligan did not believe the situation could be remedied short of terminating Plaintiff's employment. Mulligan Aff., Att.

Plaintiff agues that there are disputed issues of material fact as to when the decision to issue Plaintiff a warning letter in October was made, who drafted the letter, and whether the letter was backdated to September 10, 2008, to give the appearance that the warning was not issued in retaliation for Plaintiff's complaints of harassment on September 29, 2008. Plaintiff questions why Defendant would wait to discipline him until he returned from his business trip when he did not leave on the business trip until 16 days after Lape notified Defendant's managers of the unauthorized software issue on September 3, 2008. He also questions why Defendant was not concerned about him misusing computer equipment while on his business trip. Osmundsen testified that he suggested waiting until Plaintiff returned from the trip to give the warning to avoid upsetting Plaintiff while he was on the business trip. Although this may not have been the wisest business decision, federal courts "do not sit as a 'super-personnel department weighing the prudence of employment decisions' made by the defendants." Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir. 2005)(citing DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998)).

No evidence has been presented by Plaintiff to show that the warning letter was drafted at a time other than September 10, 2008. He questions whether the decision was made on September 10 because Osmundsen told Lape and Mulligan in an email dated September 30, 2008, that he was "trying to determine what level of punishment for [Plaintiff]." P. Opp. Mem., Ex. 30. This email,

however, was sent after Osmundsen had already confronted Plaintiff about the unauthorized software and Plaintiff provided his reply. Plaintiff also cites to the fact that on October 1, 2008, there was an exchange of emails between supervisors referring to setting up a meeting to discuss Plaintiff's software issues. P. Dep., Ex. 31. This email, however, was circulated after Plaintiff made a complaint of harassment and after it had been brought to Defendant's attention that Plaintiff had allegedly sued Parsons, his previous employer, for alleged harassment regarding issues concerning computer personal use and loading of unauthorized software.

Plaintiff also argues that he has shown that the September 10, 2008 date of the letter was false because Myers testified that the meeting where it was decided to give Plaintiff the letter was held the week of Plaintiff receiving the letter; Myers stated he did not know why the letter was dated September 10, 2008 (but thought it might be because Plaintiff was traveling); and Myers said he did not know if the meeting was held before September 10, but that it was before the letter was given to Plaintiff. See Myers Dep. 13, 39. Myers' failure to recall the date fails to show that Mulligan did not draft the letter on September 10, 2008.

Plaintiff appears to argue pretext because he now claims he did not refuse to sign the warning at the October 6, 2008 meeting, but Mulligan demanded he sign it without attaching an explanation or crossing out the software he disagreed with and Mulligan refused to let him sign it. Plaintiff, however, stated in a questionnaire presented to the EEOC on October 24, 2008, that he refused to sign the letter at the October 6, 2008 meeting. P. Dep., Ex. 42. In his interrogatory responses, Plaintiff claims that on October 6, 2008, Mulligan tried to force Plaintiff to sign the letter, but Plaintiff refused. P. Dep., Ex. 52. At his deposition (June 2010), Plaintiff testified that he thought the warning presented to him was a different copy than the one he saw earlier, he needed to talk to

Myers, he needed to think about it, and he later requested to sign it. Then, in his affidavit dated September 22, 2010, Plaintiff claimed that when he started striking out the listed software, Mulligan took the letter away and would not let him sign it. P. September 2010 Aff., ¶¶ 19-20. In emails sent to Thomas after the October 6, 2008 meeting, Plaintiff makes no mention of not being permitted to sign the warning letter. P. Dep., Exs. 38 and 39. In his October 7, 2008 email, he specifically asks that no action be taken and no warning be placed in his file, contradicting his later statement that he wanted to sign the letter. P. Dep. Ex. 39. Plaintiff cannot create an issue of fact by his own contradictory testimony. See Barwick v. Celotex Corp., 736 F.2d 946, 959-960 (4th Cir. 1984)(nonmoving party cannot create an issue of fact by making contradictory statements). Further, there is no dispute that Plaintiff refused to sign the warning as it was written.

Additionally, Plaintiff argues that he has shown pretext because there is a factual dispute regarding the circumstances surrounding his discharge, especially that Defendant did not provide him additional time to meet with Human Resources Director Myers when Plaintiff did not feel that he was prepared for the meeting at the set time. This fails to show pretext. Plaintiff has presented nothing to show that Defendant was required to continue to try to accommodate his requests or that he showed up for the meeting at the time arranged.

B.    Retaliation

To establish a prima facie case of retaliation under Title VII, an employee must demonstrate that:

1)    the employee engaged in protected activity;[13]

---

[13]Under Title VII, a plaintiff need not have filed a formal complaint with the Equal Employment Opportunity Commission or a state deferral agency to engage in a protected activity.
(continued...)

2)    the employer took some adverse employment action against the employee; and

3)    a causal connection existed between the protected activity and the adverse action.

See Haulbrook v. Michelin North America, Inc., 252 F.3d. 696, 706 (4th Cir. 2001)(ADA); Causey

v. Balog, 162 F.3d 795, 803 (4th Cir. 1998)(ADEA and Title VII); Carter v. Ball, 33 F.3d 450, 460

(4th Cir. 1994)(Title VII). If the plaintiff establishes a prima facie case, the burden shifts to the

defendant to produce evidence of a legitimate, non-discriminatory reason for the adverse action.

Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). If the defendant meets this

burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was

pretextual. Reeves, 530 U.S. at 147 (2000).

(1)    Prima Facie Case

Defendant argues that Plaintiff cannot establish a prima facie case of

retaliation because he cannot show that he engaged in protected activity prior to September 29, 2008,

and he cannot show a causal connection between his complaint on September 29, 2008 and the

warning on October 3, 2008, or his termination on October 7, 2008.

Plaintiff fails to show a causal connection between the protected activity on September 29,

2008 of his complaining about Heneage's alleged harassment and the adverse actions of his being

presented with a warning notice and then being terminated.[14] As discussed above, Plaintiff has failed

_____

[13](...continued)
Complaints to supervisory or management employees concerning harassment or discriminatory treatment as well as informal complaints, filing of internal grievances, and complaints to an agency are included within the definition of protected activity. Warren v. Halstead Indus., Inc., 802 F.2d 746, cert. denied, 487 U.S. 1218 (1988); Mitchell v. Baldrige, 759 F.2d 80 (D.C. Cir. 1985).

[14]Plaintiff also does not show a causal connection based on time alone as to complaints to Mulligan about the prayer incident in April or May 2007, or as to his alleged complaints about
(continued...)

to present any credible evidence to contradict that the warning letter was drafted on September 10, 2008, and the decision to present it to him was made before he complained about Heneage on September 29, 2008.

        (3)    <u>Legitimate/Nondiscriminatory Reason/Pretext</u>

Even if Plaintiff can establish his prima facie case of retaliation, Defendant has articulated legitimate, nondiscriminatory reasons for its actions, as discussed with regard to Plaintiff's disparate discipline claim above. Also, as discussed above, Plaintiff fails to show that these reasons are false or pretext for discrimination.

        C.    <u>Harassment/Hostile Work Environment</u>

Plaintiff alleges that he has established a claim for hostile work environment based on the totality of circumstances concerning the alleged harassing comments and conduct. Defendant contends that Plaintiff cannot establish a claim for hostile work environment because many of the alleged instances of harassment did not occur or were not motivated by religious or national origin animosity, the conduct alleged was not sufficiently severe or pervasive to create an abusive

---

[14](...continued)
Heneage in the fall of 2007. <u>See</u>, <u>e.g.</u>, <u>Pascual v. Lowe's Home Ctrs., Inc.</u>, No. 05-1847, 2006 WL 2226571 (4th Cir. Aug. 2, 2006)(holding that three to four months between the termination and protected activities is too long to establish a causal connection by temporal proximity alone); <u>Shields v. Federal Express Corp.</u>, No. 03-2103, 2005 WL 102990 (4th Cir. Jan. 19, 2005)(three to four months was insufficient to raise an inference); <u>Hooven-Lewis v. Caldera</u>, 249 F.3d 259, 278 (4th Cir. 2001)("A six month lag is sufficient to negate any inference of causation."); <u>Garrett v. Lujan</u>, 799 F. Supp. 198, 202 (D.D.C.1992)(concluding that the passage of nearly a year precluded an inference of causal connection); <u>Parrott v. Cheney</u>, 748 F. Supp. 312 (D.Md.1989)(even the passage of as little as five months between filing EEOC complaint and adverse action may be enough to negate causal connection in a particular factual context), <u>aff'd</u> <u>per</u> <u>curiam</u>, 914 F.2d 248 (4th Cir. 1990). Further, Plaintiff has not argued retaliation based on these incidents in his opposition memorandum.

environment, and there is no basis for imputing liability to Defendant for Plaintiff's harassment claims.

To prevail on a Title VII hostile work environment claim based on religion or national origin, a plaintiff is required to present evidence establishing that "(1) the subject conduct was unwelcome; (2) it was based on the [religion or national origin] of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." Spicer v. Virginia Dep't of Corrs., 66 F.3d 705, 710 (4th Cir.1995) (en banc); see also Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003)(en banc); E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306 (4th Cir. 2008)(religion); Amirmokri v. Baltimore Gas and Elec. Co., 60 F.3d 1126 (4th Cir. 1995)(national origin).

There is genuine dispute of material fact as to whether the alleged comments and conduct were severe or pervasive. Plaintiff has alleged that supervisor Mulligan yelled at him about praying in the storage room, threatened to make him stop praying at work, and made jokes about his getting "prayer water" on the floor of the restroom. He alleges that co-worker Heneage made numerous offensive comments to him and sent him two offensive emails. Additionally, Plaintiff claims that co-worker Robinette gave him the "finger," he found toothpicks in his car locks in the parking lot, co-worker Usry worked late ostensibly to check on him, Computer Support disabled his VPN connection prior to a business trip, Computer Support retrieved his voicemail, Defendant disciplined him for installing unauthorized software when some of it had been approved, and Defendant allegedly reported him to the FBI.

In Faragher v. City of Boca Raton, 524 U.S. 775 (1998), the Supreme Court reaffirmed its previously articulated standard for determining when a plaintiff has established a hostile work environment in violation of Title VII, stating a plaintiff must establish that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787 (citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22(1993)). Actionable harassment occurs when the workplace is "permeated with discriminatory intimidation, ridicule, and insult." Harris, 510 U.S. at 21.

Although a number of the alleged acts of harassment do not appear to have occurred or been motivated by religious or national origin animosity, many of the incidents were based on such prohibited factors. Plaintiff was harassed on numerous occasions by his co-worker Heneage. Most, although not all, of that harassment was based on his national origin/religion including the "You might be a terrorist" email, the Suez Canal comment, and disparaging comments about Plaintiff's religion. Additionally, in the light most favorable to Plaintiff, supervisor Mulligan yelled at Plaintiff about praying at the office, told him he would force him to stop praying at the office, and later made jokes about Plaintiff and other Muslim employees getting water on the restroom floor as part of their prayer preparation.

There is also a genuine dispute of material fact as to whether the alleged harassment is imputable to Defendant. Defendant argues that once it learned that Plaintiff and other Muslim employees needed a place to pray, it provided them a place in which they would not be interrupted. As noted above, however, in the light most favorable to Plaintiff he was harassed about his preparations for prayer (washing his feet) after that time. There are also questions of fact about when

and how Plaintiff complained about Heneage's comments/action. Plaintiff testified that he tried to discuss the comments with Thomas and Mulligan in the fall of 2007; Thomas told him to wait to talk about Mulligan; and Mulligan laughed when Plaintiff told him about Robinette giving him the finger, such that Plaintiff did not proceed to tell him about the Heneage comments. P. Dep. 170-171, 177-178. Later, Plaintiff said he must have mentioned something about Heneage's comments to Mulligan, but was unable to provide the exact words. P. Dep. 180. There is no dispute that Plaintiff complained about the emails from Heneage and other harassment on September 29, 2008. Although Heneage was given a written warning as to the emails, it was not given until the day before Plaintiff was terminated, and the warning does not discuss any of the alleged harassing comments by Heneage.

Defendant also argues, for the first time in its reply brief, that it cannot be held vicariously liable for Mulligan's actions, as the harassment about praying stopped after Mulligan's apology, Plaintiff did not report the incident to higher management, and Defendant has an effective policy against harassment. In Burlington Indus., Inc. v. Ellerth 524 U.S. 742 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775 (1998) the Supreme Court held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by [the employee's] supervisor." Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807. However, when no tangible employment action is taken (such as termination, a demotion, or a transfer), an employer may defend against liability or damages if it established by a preponderance of the evidence: "(a) that the employer exercised reasonable care to prevent and correct promptly any [] harassing behavior [based on a protected factor], and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise." Id. There are genuine issues of fact as to whether Defendant exercised reasonable care

to prevent the alleged harassment and as to whether Plaintiff unreasonably failed to take advantage of preventative measures in his reporting of the incident.  Although Defendant argues that there was no more harassment after Mulligan's apology, Plaintiff alleges he was harassed about washing his feet to prepare for prayers.  There  is also a genuine dispute as to whether Plaintiff's discipline is a tangible employment action in connection to Mulligan's alleged harassment.

      D.    <u>Defamation</u>

      Plaintiff alleges that Defendant defamed him by telling URS employees that Plaintiff was being terminated for refusing to translate either an Arabic or encrypted email. Plaintiff also alleges that Defendant defamed him by sending his computers to the FBI.[15]  He claims that this could be viewed by a jury as an insinuation that Defendant was unfit for his profession or that Plaintiff's actions involved a crime of moral turpitude.  Defendant argues that Plaintiff fails to establish a claim for defamation because he fails to show a defamatory statement or act by Defendant that was not protected by privilege.  Defendant argues that statements to URS are protected by the qualified privilege afforded to intra-corporate communications, it did not contact Plaintiff's current employer, it did not send Plaintiff's computers to federal agencies, and Plaintiff has no evidence that the other acts he alleges are defamatory ever occurred.

      The tort of defamation allows a plaintiff to recover for injury to his or her reputation as the result of the defendant's communications to others of a false message about the plaintiff. <u>Holtzscheiter v. Thomson Newspapers, Inc.</u>, 506 S.E.2d 497, 501 (S.C. 1998).  Defamatory communications take two forms:  libel and slander.  Slander is a spoken defamation while libel is a

---

[15]Plaintiff also alleges that Defendant defamed him by contacting his current employer.  He has, however, presented no evidence to support this assertion.

written defamation or one accomplished by actions or conduct.  Id.  If a communication is libelous, then the law presumes the defendant acted with common law malice.  Id.  Under South Carolina law, to state a cause of action for defamation, a plaintiff must show the existence of some message that (1) is defamatory, (2) is published with actual or implied malice, (3) is false, (4) is published by the defendant, (5) concerned the plaintiff, and (6) resulted in legally presumed or in special damages.[16]  Parker v. Evening Post Pub. Co., 452 S.E.2d 640, 644 (S.C. Ct. App. 1994), cert. denied, 516 U.S. 1172 (1996).  Defamation need not be accomplished in a direct manner.  Eubanks v. Smith, 354 S.E.2d 898 (1987); Tyler v. Macks Stores, 272 S.E.2d 633 (1980).  A mere insinuation is actionable as a positive assertion if it is false and malicious and its meaning is plain.  Id.

Plaintiff fails to show that he was defamed as to any statements by Defendant to Galunic.  He claims that he was defamed because employees of Defendant told Galunic that Plaintiff was terminated because of an Arabic or encrypted email.  He, however, fails to show which employee is allegedly responsible.  Galunic testified that he heard this comment from Kate Bitterwolf (who did not work for Defendant) and not from Myers.  Galunic Dep. 15, 26.  Further, Plaintiff fails to show special damages from the alleged defamatory statement(s).  Galunic testified that regardless of whether Plaintiff was terminated because of an Arabic or encrypted email, or because he had repeatedly downloaded unapproved software and then refused to accept responsibility for doing so,

---

[16]An allegedly defamatory statement can either be "actionable per se" or "not actionable per se."  Holtzcheiter, 506 S.E.2d at 510.  A statement that is actionable per se does not require proof of special damages.  Id.  A statement that is not actionable per se cannot support a defamation claim without evidence of "tangible losses or injury to the plaintiff's property, business, occupation or profession, capable of being assessed monetarily."  Id.  All libel is actionable per se, but slander is only actionable per se if it relates to one of the following five categories: (1) the commission of a crime of moral turpitude; (2) the contraction of a "loathsome disease"; (3) adultery; (4) lack of chastity; and (5) "unfitness in one's business or profession."  Id. at 501.  Whether a statement is actionable per se is a matter of law for the court.  Id. at 510.

the fact that Plaintiff was terminated for cause by Defendant, which is a division of URS, made Plaintiff ineligible for hiring with any other URS division. Galunic Dep. 31. Thus, Plaintiff could not be hired by Galunic ( or URS) as he had been terminated by Defendant for cause.

Plaintiff also fails to establish a claim for defamation based on Defendant sending its hard drives (from computers that had been used by Plaintiff) to the FBI. Contrary to Plaintiff's assertions, he has provided no evidence that Defendant sent the hard drives to the FBI until the FBI requested them. Plaintiff has not shown that there was any defamatory statement or action "published" as a result of the hard drives being sent to the FBI. Further, an "absolute privilege exists as to any utterance arising out of the judicial proceeding and having any reasonable relation to it, including preliminary steps leading to judicial action of any official nature provided those steps bear reasonable relation to it." Crowell v. Herring, 392 S.E.2d 464 (S.C. Ct. App. 1990).

## MOTION TO STRIKE

Plaintiff appears to request that two affidavits attached to Defendant's reply brief (to its motion for summary judgment) be stricken. Specifically, he argues that affidavits from Bevirt (Ex. E) and Myers (Ex. I) be stricken because they were prepared after Plaintiff's response to Defendant's motion for summary judgment such that Plaintiff cannot respond to them, and that Defendant could have submitted these affidavits as exhibits to the original motion. Defendant argues that these affidavits were produced to address issues raised in Plaintiff's opposition memorandum. In his reply, Plaintiff argues that Defendant should already have known about these issues.

These affidavits, which are based on personal knowledge, set out facts that would be admissible in evidence (see Fed. R. Civ. P. 56). Further, they address issues which Plaintiff raises in his opposition memorandum.[17] It is, therefore, recommended that the motion to strike be denied.

## CONCLUSION

Based on the foregoing, it is recommended that Defendant's motion for summary judgment (Doc. 35) be **granted, in part**, as to Plaintiff's claims for disparate discipline, retaliation, and defamation; and be **denied, in part**, as to Plaintiff's claim for harassment/hostile environment. It is also recommended that Plaintiff's motion to strike (Doc. 41) be **denied**.

Joseph R. McCrorey
United States Magistrate Judge

March 2, 2012
Columbia, South Carolina

---

[17]Further, even if these affidavits are not considered, it would not change the recommendation here.